**UNITED STATES**

v.

**Senior Airman Reginald T. ATTUCKS II, United States Air Force.**

**ACM 35946.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 6 April 2004.

31 Oct. 2006.

Appellate Counsel for Appellant: Colonel Carlos L. McDade, Major Sandra K. Whit-

tington, Major Karen L. Hecker, and Captain Christopher S. Morgan.

Appellate Counsel for the United States: Colonel Gary F. Spencer, Lieutenant Colonel Robert V. Combs, and Major Stacey J. Vetter.

Before MOODY, Senior Judge, SMITH, and PETROW, Appellate Military Judges.

## OPINION OF THE COURT

PETROW, Judge:

The appellant was convicted, contrary to his pleas, of one specification of dereliction of duty and one specification of the wrongful use of marijuana and one specification of the wrongful use of cocaine, in violation of Articles 92 and 112a, UCMJ, 10 U.S.C. §§ 892, 912a. On appeal, the appellant asserts two errors: first, that the appellant's conviction for using cocaine was unjustified given that he was unaware that the marijuana he was smoking was laced with cocaine; and second, that the military judge erred by failing to suppress the results of appellant's urinalysis and subsequent statement which resulted from an invalid unit inspection.[1] For the reasons set out below, we find no merit in either assignment of error and affirm.

*Background*

On 17 October 2003, Lieutenant Colonel (Lt Col) Lowdermilk, appellant's commander, directed that a quarters inspection and urinalysis of his squadron members be conducted on the following day. His order directed a room-by-room inspection of the squadron's three dormitories and a urinalysis of those unit members then assigned to the dormitories. The inspection was scheduled for a Saturday, on 18 October 2003, since most of the members would be in the dorms and there would be less disruption of the squadron's work schedule. While the rooms were inspected, occupants were to be taken to the base community center where the urinalysis samples would be obtained. The rooms of those members not present were also to be inspected and they would be ordered to provide a urinalysis sample as soon as reasonable upon their return. The inspection had been coordinated for the previous several weeks with the base drug demand reduction office, which would be responsible for the urinalysis testing. Coordination was also implemented with the first sergeants of those residents who were not members of the appellant's squadron.

The day before the inspection, Lt Col Lowdermilk prepared a "Memorandum for Record" identifying the buildings to be inspected, the time of the inspection, and the manner in which the room inspections were to be conducted. The memorandum also stated that a drug detection dog would be used. It cited the purpose of the inspection to be to "ensure the security, military fitness, and good order and discipline of those under my command." The memorandum made no mention of the urinalysis testing that was to be completed. Lt Col Lowdermilk testified that he had orally ordered the urinalysis to be conducted, and that it had clearly been his intent as evidenced by the reservation of the community center and the prior coordination with the base personnel necessary for administering the urinalysis testing. He testified during a motion hearing, that he had a suspicion that there might be drugs in the dorms. At some time prior to his ordering the inspection, at least two unit members residing in the dormitories had tested positive for controlled substances. However, Lt Col Lowdermilk testified he had no particularized suspicion that the appellant or any other members then residing in the dormitories had been using drugs.

On the day of the inspection, Saturday, 18 October 2003, the members present were provided with a written order signed by Lt Col Lowdermilk, directing them to submit to a urinalysis. Fifty-nine dormitory residents, including the appellant, were not present during the inspection and did not participate in the urinalysis held that day. All were subsequently tested.

The appellant returned to base on Sunday, 19 October 2003, and reported to his duty section on Monday, 21 October 2003. On the following day, the appellant was directed to provide a urinalysis sample by Master Ser-

---

1. This issue is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982).

geant (MSgt) Clark, his first sergeant, through a written order dated that day and signed by MSgt Clark. In the heading of the letter, Lt Col Lowdermilk's official duty title was in the "From" line. On 21 July 2003, Lt Col Lowdermilk had delegated authority in writing to MSgt Clark, as well as others, to sign the "Order to Provide Specimen Memorandum," when he was "not available." Lt Col Lowdermilk was present for duty on 21 October 2003. The delegated authority was primarily intended to be used to facilitate testing in instances where the drug demand reduction office provided a name or names of members, which had been randomly selected for a urinalysis. The delegates could then direct the member to submit to the urinalysis if the commander was not available. The use of the delegation of authority in conjunction with the 18 October 2003 inspection was based on the need to test those members who were not available on the day of the original inspection.

The appellant's urinalysis was positive for the presence of marijuana and cocaine metabolites. After the test results were discovered, the Air Force Office of Special Investigations interviewed the appellant. At that interview, appellant admitted orally and in writing, that on 18 October 2003 he had been offered the opportunity to partake of his friend's cigar, which he believed to contain marijuana. The appellant demurred several times, but eventually acquiesced. The appellant noticed that the cigar tasted unusual. Familiar with his friend's history of seeding his marijuana with cocaine, he inquired if anything else had been added to the cigar and received a negative response.

*Discussion*

*Issue I: Legal Sufficiency of Conviction for Cocaine Use*

■ The test for determining the legal sufficiency of evidence in support of a finding of guilty is whether, when the evidence is viewed in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*

*v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Quintanilla,* 56 M.J. 37, 82 (C.A.A.F.2001); *United States v. Turner,* 25 M.J. 324, 325 (C.M.A.1987).

*Manual for Courts–Martial (MCM),* Part IV, ¶ 37b(2) (2002 ed.), requires that for a successful prosecution based on the wrongful use of a controlled substance the government must establish (a) that the accused used a controlled substance, and (b) that the use by the accused was wrongful.[2] The use will not be deemed wrongful if done without knowledge of the contraband nature of the substance. *Id.,* at ¶ 37c(5). Knowledge of the presence of the controlled substance may be inferred from the presence of the controlled substance in the accused's body or from other circumstantial evidence. *Id.,* at ¶ 37c(10). This permissive inference may be legally sufficient to satisfy the government's burden of proof as to knowledge. *Id.*

In *United States v. Stringfellow,* 32 M.J. 335 (C.M.A.1991), our superior court was faced with similar circumstances, in which the appellant knowingly ingested one controlled substance, while ignorant of the fact that he was also ingesting a second. The Court concluded that the appellant clearly knew that he was ingesting *some* type of controlled substance, and the fact that he was unaware of "the exact pharmacological identity of the substance he ingested is of no legal consequence." *Id.* at 336.

Nonetheless, the appellant seeks to distinguish the instant case from *Stringfellow* on the basis that in the latter the use of both substances was alleged in a single specification. This issue was addressed by our superior court in *United States v. Dillon,* 61 M.J. 221 (C.A.A.F.2003). In *Dillon,* the appellant had knowingly ingested several pills of ecstasy, not knowing that he was also ingesting methamphetamine. The appellant was charged with use of both drugs in separate specifications. The appellant argued that doing so was an unreasonable multiplication of charges. *Id.* at 222. Citing the rationale of *United States v. Inthavong,* 48 M.J. 628, 631 (Army Ct.Crim.App.1998), the Court agreed

---

**2.** The 2002 edition of the *MCM* was in effect at the time of the appellant's trial. The 2005 edi-

tion of the *MCM* has identical requirements under Part IV, ¶ 37b(2), ¶ 37c(5), and ¶ 37c(10).

that Article 112a, UCMJ, had been modeled after 21 U.S.C. § 841(a), to address the cumbersome and unnecessary litigation stemming from the numerous ways drug offenses were charged under general regulations. *Dillon,* 61 M.J. at 223. The prohibitory language in the latter targets "a controlled substance" and in the former "a substance described in subsection (b)." *Id.* The Court concluded that this evidenced Congressional intent to permit separate specifications for the use of each controlled substance. *Id.*

In addition, the Court cited *United States v. Bonilla Romero,* 836 F.2d 39, 46–47 (1st Cir.1987), noting with approval its finding that Congress may authorize the imposition of cumulative punishments for criminal offenses occurring in the same act, and that the double jeopardy clause is not implicated so long as each statutory violation requires proof of an element or fact which the others do not. *Dillon,* 61 M.J. at 223.

In the case sub judice, the government proved two independent facts, that is, that the appellant used marijuana *and* cocaine. Accordingly, based on the holdings in *Stringfellow* and *Dillon,* we find that the appellant's asserted lack of knowledge as to the fact that the marijuana he ingested was laced with cocaine does not preclude his conviction for use of the cocaine. *Stringfellow,* 32 M.J. at 336; *Dillon,* 61 M.J. at 223. Likewise, we find the appellant's claim that charging the use of both drugs in separate specifications as being an unjustifiable multiplication of charges, to be without merit.

### Issue II: Validity of Inspection

When there is a motion to suppress, appellate review of the military judge's findings of fact is on a clearly-erroneous standard, and conclusions of law are reviewed de novo. *United States v. Swift,* 53 M.J. 439, 446 (C.A.A.F.2000); *United States v. Ayala,* 43 M.J. 296, 298 (C.A.A.F.1995). A military judge's finding regarding the primary purpose of an inspection is a question of fact, which will be reviewed under the clearly-erroneous standard. *United States v. Shover,* 45 M.J. 119, 122 (C.A.A.F.1996).

The appellant's attack on the validity of the unit inspection has three bases: first, that the inspection was, in fact, a subterfuge to justify a warrantless search of the appellant's urine for evidence of illegal drug use; second, that the delay between the inspection and the demand to the appellant to provide a urine sample effectively dissipated the unit inspection basis for a warrantless search of the appellant's urine; and, third, that MSgt Clark was not vested with the requisite command authority to order the appellant to provide his urine sample for testing.

Mil. R. Evid. 313(b) permits the admission at trial of evidence obtained from unit inspections. *MCM,* Part III, (2002 ed.).[3] The rule defines an inspection as "an examination of the whole or part of a unit ... conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit...." Mil. R. Evid. 313(b). An examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not deemed an inspection under the rule. *Id.*

Mil. R. Evid. 313(b), also provides that if a purpose of the examination is to locate weapons or contraband, and the examination was directed immediately following a report of a specific offense in the unit and was not previously scheduled; specific individuals were selected for examination; or persons examined are subjected to substantially different intrusions during the examination, the prosecution must prove by clear and convincing evidence that the examination was an inspection within the meaning of the rule. In his findings on the appellant's suppression motion, the military judge concluded that none of these three circumstances existed with regard to the unit inspection undertaken by the appellant's commander, and, accordingly, the prosecution was held to a preponderance of the evidence standard as to the propriety of the inspection. We concur with that conclusion.

Lt Col Lowdermilk's 17 October 2003, "Memorandum for Record," identified the purpose of the inspection to be to "ensure the

---

**3.** Mil. R. Evid. 313(b) in the 2005 edition of the *MCM* is identical to the 2002 edition of the *MCM* that was in effect at the time of the appellant's trial.

security, military fitness, and good order and discipline of those under my command." In his testimony on the motion, he stated that the purpose was "for good order and discipline, morale, health, welfare, and safety." Lt Col Lowdermilk also testified that, due to the need to coordinate with the other base agencies involved, the planning for the inspection had begun several weeks before the inspection took place.

When asked by trial defense counsel whether he had been concerned about there being a drug problem in the dorms, Lt Col Lowdermilk responded that he had a suspicion that there might be drugs in the dorms. In response to the trial defense counsel's question as to what else, other than drugs, they would be inspecting for, Lt Col Lowdermilk responded, "any unauthorized items such as weapons, aircraft parts . . . things that are unsafe . . . propane tanks . . . anything that was unauthorized and unsafe." He further testified that at the time he ordered the inspection, he had no particularized suspicion that the appellant had been using drugs, nor was he targeting anyone specifically with the intention of catching them with drugs. In response to trial defense counsel's question as to what his intent was with regard to individuals found to be in possession of drugs, Lt Col Lowdermilk responded that the evidence would be gathered and that any judicial or administrative action would be dependent upon that evidence.

In addition to Lt Col Lowdermilk's testimony on the motion, MSgt Clark testified that the inspection of 18 October 2003 was brought about due to incidents of vandalism, underage drinking, theft within the dorms, and several positive results from random drug urinalysis testing. On cross-examination, MSgt Clark stated that, some time prior to the inspection, two airmen had tested positive for drugs, and that the commander, concerned about the impact such drug use could have on the good order and discipline of the squadron, hoped that the inspection would help to discourage such use and act as a deterrent.

■ So long as the primary purpose of the examination is "unit readiness" and not disciplinary proceedings, it is permissible both:

(1) for an inspection to take place after the commander receives specific information about the presence of contraband; and (2) for an inspection for weapons or contraband to result in disciplinary proceedings. *United States v. Jackson*, 48 M.J. 292, 294 (C.A.A.F. 1998).

■ In *Jackson*, the commander was informed by the Army Criminal Investigation Command, that an anonymous friend of the appellant had witnessed him selling drugs in his barracks room the previous evening. *Id.* at 294. After consulting with the legal office, the commander determined that the information about distribution of drugs in the barracks was not sufficient to authorize a probable cause search of Private (PVT) Jackson's room under Mil. R. Evid. 314, but it was sufficient to raise concerns about unit readiness. *Id.* The commander then directed a health and welfare inspection of the unit "to find out on a whole what the unit was like for drugs and if anybody else had been using" drugs. *Id.* at 294–95. Drug detecting dogs were used in the search of all 36 of the unit's barracks rooms. *Id.* One of the dogs alerted in PVT Jackson's room and marijuana was discovered inside a speaker. The military judge denied PVT Jackson's motion to suppress the drug evidence, finding that the primary purpose of the examination was to ensure "unit readiness." Our superior court concluded that, in fact, the prosecution had met its burden and concurred in the conclusion of the trial judge. *Id.*

Similar to *Jackson*, the commander in the case sub judice was aware of several unit members having tested positive for illegal drug use, drug-detecting dogs were used during the inspection, and the commander asserted that the purpose of the inspection was the health and welfare of the unit. Unlike *Jackson*, the appellant in this case was not suspected of illegal drug use prior to the inspection. Based on these observations and the guidance provided in *Jackson*, we conclude that the Government has met its burden of establishing that the inspection qualified as such under the requisites of Mil. R. Evid. 313(b).

■ The second issue raised by appellant regarding the validity of the unit inspection, is the delay between the start of the inspection and the time that appellant was ordered to provide a urine sample. Appellant claims that the inspection should be limited in scope to the members present at the time of the inspection. On the day of the inspection, the members present were provided with a written order directing them to submit to a urinalysis. As previously cited, 59 dorm residents, including the appellant, were not present during the inspection and did not participate in the collection of urine samples held that day. All were subsequently tested, some as late as January of the following year.

Mr. Feist, the base drug testing program manager, testified that he assisted in coordinating the inspection. From his conversations with Lt Col Lowdermilk, he understood that the objective was to test *all* the members of the squadron residing in the dormitories, including those not present on the day of the inspection. Mr. Feist created a roster containing the names of all of the dorm residents, and subsequent to the inspection, prepared a "due back" list of those who were not present to be tested. The appellant's name appeared on the list. The "trusted agents" in the orderly room were given the names and were responsible for calling the members' sections to determine if the member had returned to duty and was available to be tested. The appellant had returned to base on Sunday, 19 October 2003, and reported to his duty section on Monday, 20 October 2003. On the following day, the appellant was directed to provide a urinalysis sample by MSgt Clark.

The 24–hour delay in directing the appellant to submit his sample did not serve to disassociate the submission from the inspection. There are a number of facts that we believe support this finding. This was a planned inspection, including prior coordination with the drug testing office to implement the urinalysis testing and with security forces to provide drug-detection dogs. Letters were provided to all members present during the inspection ordering them to provide urine samples. Additionally, there was the post-inspection preparation of a list of the 59 members who were not present, the providing of that list to the "trusted agents" in the unit orderly room to arrange for the testing of the missing members as soon as reasonably possible, and MSgt Clark directing the appellant on 21 October 2003, to submit a urine sample. We find that cumulatively, this evidenced a clear intent that the inspection was to include urinalysis testing of all members of the unit then residing in the dormitories, whether or not they were present the initial day of testing. Therefore, we disagree with appellant's contention that his urinalysis was outside the scope of the unit inspection originally held on 18 October 2003.

■ The final issue raised by the appellant concerns the appropriateness of MSgt Clark's written order, directing the appellant to provide a urine sample. The facts clearly establish that Lt Col Lowdermilk had intended that, as part of the inspection, all members of his command residing in the dormitories were to undergo urinalysis testing, that he had issued a verbal order to that effect as well as in writing to those members who were present for the inspection on 18 October 2003, that the taking of appellant's urinalysis sample was part of that inspection, and that the inspection met the requisites of Mil. R. Evid. 313(b). Therefore, we conclude that the military judge did not err by admitting the test results into evidence.

### Conclusion

Accordingly, the approved findings and sentence are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Reed,* 54 M.J. 37, 41 (C.A.A.F.2000). Accordingly, the approved findings and sentence are

AFFIRMED.

Senior Judge MOODY participated in this decision prior to his retirement.

Judge SMITH participated in this decision prior to his reassignment.